The UNITED STATES of America,
Plaintiff–Appellee,

v.

Moises OTERO, Defendant–Appellant.

No. 87–2336.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 13, 1988.

Decided June 15, 1988.

Rehearing and Rehearing In Banc
Denied Aug. 10, 1988.

Warren Hill, Chicago, Ill., for defendant-appellant.

Zaldwaynaka L. Scott, Asst. U.S. Atty., Anton Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, CUDAHY, and COFFEY, Circuit Judges.

BAUER, Chief Judge.

Moises Otero appeals from his conviction of knowingly distributing 24.58 grams of a mixture containing heroin in violation of 21 U.S.C. § 841(a)(1). He contends on appeal that his trial counsel rendered constitutionally ineffective assistance, and that the district court erred in denying his request for an evidentiary hearing to determine whether he was denied his sixth amendment right to a speedy trial. We reject both arguments and affirm Otero's conviction.

I.

During the morning of January 5, 1977, Drug Enforcement Administration (DEA) Agent George Faz received a telephone call in his office from a cooperating individual (CI) regarding a prospective purchase of drugs. Faz arranged a meeting with the CI and set up a surveillance team that included Chicago Police Detectives George Graham and Matthew Plovanich. Faz then picked up the CI in his unmarked government vehicle, and next picked up Max DeJesus, who directed Faz to a tavern on Montrose Avenue in Chicago, which the three men entered. Twenty minutes later, Plovanich and DEA Agent Frank Cruz, another member of the surveillance team, went into the "fairly well lit" tavern to observe Faz and the others.

Inside the tavern, Faz, the CI, and DeJesus sat down at a table, where they were joined by Victor Colon. During their ensuing conversation, DeJesus repeatedly assured Faz that a heroin supplier would be arriving shortly. After about a half-hour, Otero pulled up in front of the tavern in his red 1965 Ford Thunderbird two-door, Illi-

nois license plate number ZN4428. Faz could see the car through a window facing the street. Colon and DeJesus went out to the car and, after a brief conversation, reentered the tavern with Otero. Faz, the CI, DeJesus, Colon, and Otero then discussed the heroin deal. Otero, accompanied in his car by Colon, then led Faz, the CI, and DeJesus (and members of the surveillance team) to a building at 3854–56 North Southport Avenue in Chicago, which Otero entered. Colon got out of Otero's car to tell Faz that Otero had gone to get the heroin. About ten minutes later, Otero came back out to his car. Faz then got into the passenger seat of Otero's car with Otero. Inside the car, Otero said he had the "stuff" and gave Faz a clear plastic bag containing brown powder which a laboratory analysis later revealed to be heroin. Faz put the bag in his sock and retrieved $900 in government funds from the trunk of his car, which he gave to Otero. Everyone then left the scene.

On August 18, 1977, Otero, DeJesus, Colon, and another codefendant, Juan Argon, were charged with knowingly distributing 24.58 grams of a mixture containing heroin in violation of 21 U.S.C. § 841(a)(1). The same day, a warrant was issued for Otero's arrest and Otero's arraignment was scheduled for August 20, 1977. Otero, however, was not arrested until April 8, 1987, when he surrendered to federal authorities in Ohio. From July 31, 1979 until that time, the government had placed Otero's case on fugitive status. On April 20, 1987, Otero pled not guilty to the drug charge. On May 18, 1987, United States District Judge James F. Holderman scheduled Otero's trial for June 1, 1987.

On the morning of his trial, Otero moved for the first time to dismiss the indictment, arguing that the delay between his indictment and trial had deprived him of his constitutional rights to a speedy trial and due process. The court denied the motion. Otero then orally amended his motion, arguing that the government was required to show that it actively attempted to locate him after he was indicted and before it placed his case on fugitive status. The court also denied this amended motion,

holding that it was legally insufficient to raise a constitutional question. Otero twice moved the court to reconsider whether a hearing on the issue of pretrial delay was appropriate, once during trial and, later, in a post-trial motion. The court denied these additional motions, however, and, upon conviction by the jury, sentenced Otero to two years imprisonment and a mandatory parole term of three years.

## II.

Otero's first contention is that his privately retained counsel rendered constitutionally ineffective assistance at his trial. In his brief, he sets forth fifteen "professional errors" committed by his counsel that allegedly were so serious they caused a breakdown in the adversarial process. We disagree.

The sixth amendment right to counsel exists to protect the defendant's fundamental right to a fair trial. *Strickland v. Washington*, 466 U.S. 668, 684, 104 S.Ct. 2052, 2062, 80 L.Ed.2d 674 (1984). As the Supreme Court has stated, "access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled." *Id.* at 685, 104 S.Ct. at 2063 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275–76, 63 S.Ct. 236, 240, 87 L.Ed. 268 (1942)). For this reason, the defendant is entitled to more than just a warm body standing next to him during the criminal process; he or she is entitled to reasonably effective legal assistance. *Id.* at 687–88, 104 S.Ct. at 2064–65.

Under *Strickland*, defendants' ineffective assistance claims present a two-part inquiry. First, the defendant must show that counsel's performance fell below an objective standard of reasonableness. To do so, the defendant must identify "acts or omissions of counsel that are alleged not to have been the result of professional judgment." *Id.* at 690, 104 S.Ct. at 2066. This is not an easy task. The defendant must overcome a strong presumption that counsel rendered reasonably effective as-

sistance, *id.* at 690, 104 S.Ct. at 2066, and convince the reviewing court that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* Moreover, challenges to strategic or tactical decisions made by trial counsel are off-limits. *United States v. Dyer,* 784 F.2d 812, 817 (7th Cir.1986); *United States v. Giangrosso,* 779 F.2d 376, 380 (7th Cir. 1985), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1237, 89 L.Ed.2d 345 (1986). Second, even if counsel performed in a professionally unreasonable manner, the defendant also must establish that counsel's error prejudiced his defense. *Strickland,* 466 U.S. at 691–92, 104 S.Ct. at 2066–67. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding," or "'impaired the presentation of the defense,'" *id.* at 693, 104 S.Ct. at 2067, rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

■ Otero asserts a plethora of "acts or omissions" committed by his trial counsel that he claims warrant reversal. We will first address his counsel's allegedly fatal omissions. In this category, Otero first argues that his counsel failed to investigate the ownership of the red Thunderbird, license plate ZN4428, which Detective Graham described at trial. The government introduced a certified record establishing that, in 1977, this license plate was registered to a 1965, two-door Ford Thunderbird owned by one Moises Otero. After Otero's counsel cross-examined Graham, the court granted counsel a one-day continuance to discuss the matter with his client and conduct an investigation. The record, however, does not reveal to what extent Otero's counsel conducted an investigation, if any. Nor does it reveal any other information concerning statements made by Otero to his counsel, which the Court in *Strickland* stated would influence substantially the reasonableness of counsel's decision whether to investigate. *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. On the other hand, the record does reveal that a man matching the physical description of the defendant drove a vehicle on the date of the drug transaction that was registered to a man with the defendant's name. Given what is and is not in the record, we cannot conclude that counsel's failure to controvert the government's evidence was an unreasonable exercise of professional judgment. In addition, Otero has failed to demonstrate any prejudice to his defense resulting from counsel's alleged failure to investigate.

■ Otero next asserts that his counsel failed to object properly to the government's introduction of certain portions of his bond hearing testimony. Yet he does not indicate what objection, if any, would have been proper or even claim that the evidence was inadmissible. Thus, this claim must fail. *See United States v. Brown,* 739 F.2d 1136, 1146 (7th Cir.) *cert. denied sub nom.,* 469 U.S. 933, 105 S.Ct. 331, 83 L.Ed.2d 268 (1984). Otero also argues that his counsel failed to object to *one* leading question asked by government counsel. The question, which concerned the street address of a certain location, arguably was subject to objection, but we are hard pressed to conclude that it prejudiced the defendant's ability to conduct his defense. Otero also points out that his counsel failed to insist that the government produce as a witness Detective Cruz, but he does not suggest in any way how Cruz's testimony would have done anything but strengthen the government's case.

■ And the list goes on. Otero claims that counsel should have presented some witnesses on his behalf and allowed him to testify, yet he does not state at all what he or any other witness he might call would testify to at trial. Absent such information, we cannot conclude that counsel's decision not to present additional witnesses, if he even had that option, was unreasonable or prejudicial. *See United States v. Giangrosso,* 779 F.2d at 381. Otero also attacks counsel's failure to subpoena a defense witness who arrived too late to testify. But the witness's claimed knowledge of a small, unobservable scar on Otero's

face would not have aided Otero's misidentification defense. Finally, Otero claims his counsel should have put him on the stand. But the decision whether to take the stand is a tactical choice of trial strategy, *United States v. Dyer*, 784 F.2d at 817, which normally is not subject to judicial scrutiny under *Strickland*. Moreover, in this case, Otero assured the trial judge that he and his trial counsel had discussed the matter and that he voluntarily decided not to testify. Since nothing else in the record indicates that Otero was ill-advised, we cannot conclude that his counsel's conduct was constitutionally ineffective.

Otero also finds fault with many of his counsel's acts. He starts at the very beginning, arguing that his counsel, because of inexperience, should never have taken the case. But this simply begs the question on appeal: whether the acts or omissions of counsel fell outside the realm of professional judgment. Otero also argues that counsel conducted ineffective cross-examination of the government's eyewitnesses, *i.e.* that he failed to use some of the "textbook" cross-examination techniques on retention of memory. Whatever Otero means by this, our review of the record, which contains forty-nine pages of transcript testimony from these cross-examination witnesses, shows that counsel did indeed question the ability of each witness to positively identify Otero, and that his effort cannot be considered unreasonable. Otero also baldly asserts that his counsel unwisely stipulated to certain evidence. Again, Otero does not argue why counsel's decisions were unreasonable and what prejudice occurred. Finally, Otero argues that his counsel's failure to present properly his motions on the speedy trial issue rise to the level of ineffective assistance. But the fact remains that counsel made the motions, and the district court considered them. Indeed, in his attack on the district court's denial of those motions, Otero relies on some of the same arguments raised by his counsel below. Under these circumstances, we cannot find his counsel's advocacy constitutionally ineffective.

## III.

In his motion to dismiss the indictment on the morning trial was to begin, Otero alleged somewhat ambiguously that the long delay between the incident and the trial deprived him of his "constitutional protection to a speedy trial and due process of law." Construing Otero's motion as alleging that the delay was constitutionally excessive under the fifth amendment's due process clause, the district court declined to dismiss the indictment, holding that Otero had failed to allege that the government had intentionally delayed to gain tactical advantage or how the delay prejudiced his defense. With the court's permission, Otero then amended his motion to present a sixth amendment, post-indictment delay claim, arguing that the government made little, if any, effort to locate him between his indictment in 1977 and July 31, 1979, when his case was placed on fugitive status. Otero claimed that he had "reports" backing up his claim, but, if he did, he never proffered them to the court, which denied the amended motion as factually insufficient even to warrant a hearing. At the end of the government's case-in-chief, Otero orally asked the court to reconsider its denial of his motion to dismiss the indictment, but presented no new evidence in support of his motion. After reviewing the sixth amendment, post-indictment delay cases cited by Otero, the court denied his motion to reconsider. In his post-trial motion, Otero again asked the court to reconsider his sixth amendment speedy-trial claim, but the court denied his motion. Otero contends now that the district court erred in denying an evidentiary hearing on his sixth amendment speedy trial claim. We disagree.

The sixth amendment guarantees defendants a "speedy" trial, U.S. Const. amend. VI; *Barker v. Wingo*, 407 U.S. 514, 515, 92 S.Ct. 2182, 2184, 33 L.Ed.2d 101 (1972), a right triggered when a person becomes an "accused," *United States v. Marion*, 404 U.S. 307, 313, 92 S.Ct. 455, 459, 30 L.Ed.2d 468 (1971), which is to say when prosecution is initiated against him or her either by formal indictment or informa-

tion, or by actual restraints such as arrest and holding to answer a criminal charge. *Id.* at 320, 92 S.Ct. at 463. In this case, Otero's right to a speedy trial attached on August 22, 1977, when the grand jury returned an indictment against him.

The speedy trial concept, however, is "vague," *Barker,* 407 U.S. at 521, 92 S.Ct. at 2187, "amorphous," *id.* at 522, 92 S.Ct. at 2188, and "slippery," *id.* "It is ... impossible to determine with precision when the right has been denied." *Id.* at 521, 92 S.Ct. at 2187. Any inquiry into a speedy trial claim, therefore, "necessitates a functional analysis of the right in the particular context of the case...." *Id.* at 522, 92 S.Ct. at 2188; *Terry v. Duckworth,* 715 F.2d 1217 (7th Cir.1983) (quoting *Barker*). In *Barker,* the Supreme Court mandated that such an analysis take into account four factors: length of delay, reason for the delay, timeliness of the defendant's assertion of his right, and prejudice to the defendant. *Barker,* 407 U.S. at 530, 92 S.Ct. at 2192. None of these factors alone is dispositive of the speedy trial claim; rather, each "must be considered together with such other circumstances as may be relevant." *Id.* at 533, 92 S.Ct. at 2193. The length-of-delay factor also doubles as the balancing test's triggering mechanism. In other words, until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. *Id.* at 530, 92 S.Ct. at 2192. The government concedes that the delay in this case is presumptively prejudicial. We must, therefore, examine the other *Barker* factors.

In the *Barker* balancing process, the weight assigned to the delay is determined in part by the second factor, the explanation given for the delay. *Terry v. Duckworth,* 715 F.2d at 1220. For example,

[a] deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence ... should be weighted less heavily.... Finally, a valid reason, such

as a missing witness, should serve to justify appropriate delay.

*Barker,* 407 U.S. at 531, 92 S.Ct. at 2192. Why more than ten years passed between Otero's indictment and trial is not clear from this record. That the case was assigned to the fugitive calendar in 1979 by the district court, however, suggests that the government had not just a missing witness but a missing defendant. As the government points out in its brief, "arguably, defendant's fugitive status necessitated the delay in bringing him to trial." But this less-than-forceful assertion neither explains an appearance filed in the district court by a lawyer on Otero's behalf in 1978, nor says anything about the scope of the government's attempts to locate Otero in the two-year period before he was deemed a fugitive.

For his part, Otero certainly does not allege that the government intentionally delayed the trial for tactical advantage. It also is by no means clear that he contends on appeal that the government was even negligent in failing to locate him. He does assert that he was living a normal, "aboveground" lifestyle in Chicago until 1984 and that, in April, 1987, while in Cleveland, Ohio, he surrendered to authorities immediately upon hearing of the outstanding warrant for his arrest. This may constitute an assertion of negligence on the part of the government, but Otero's claim that he did not know of his indictment also seems contradicted by a lawyer's appearance on his behalf in this case in 1978, and none of his assertions speaks directly to negligent or intentional delay. Absent any direct evidence on this point, we cannot presume anything. *See Terry,* 715 F.2d at 1220. In short, this factor weighs in neither the government's nor Otero's favor.

The third factor, the timeliness of the assertion of the right, "concerns petitioner's responsibility to assert his right to a speedy trial." *Id.* "The defendant's assertion of his speedy trial right ... is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." Here, Otero asserted his right on the morning his trial was to begin, fourteen days after pretrial motions were due

and long after the alleged period of improper delay began. Moreover, in his motion, Otero did not even indicate when he learned of the charges against him. In any case, the district court considered the motion on the day it was filed. On these facts, we cannot weigh heavily, if at all, this factor in his favor. *See United States v. DeLeon*, 710 F.2d 1218, 1222 (7th Cir. 1983).

As for the last factor, "deprivation of the right to speedy trial does not *per se* prejudice the accused's ability to defend himself." *Barker*, 407 U.S. at 521, 92 S.Ct. at 2187. Indeed, "deprivation of the right may work to the accused's advantage." *Id.* Thus, prejudice to the defendant "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect." *Id.* at 532, 92 S.Ct. at 2193. The Court in *Barker*, identified three such interests: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.* at 532, 92 S.Ct. at 2193. Of these, the last is the most serious. *Id.* In addition, the Court has expressed concern that excessive delay may subject an accused to public scorn, deprive him or her of employment, and curtail his or her rights of free speech and association. *Klopfer v. North Carolina*, 386 U.S. 213, 222, 87 S.Ct. 988, 993, 18 L.Ed.2d 1 (1967).

Otero's allegations implicate only the interest of possible impairment to his defense. In the district court, Otero argued that he was prejudiced because the CI who assisted the government in 1977 died in 1982. But the unavailability of a witness is not prejudicial to the defendant if the prosecution produces other eyewitnesses. *United States v. Smalls*, 438 F.2d 711, 714 (2d Cir.), *cert. denied*, 403 U.S. 933, 91 S.Ct. 2261, 29 L.Ed.2d 712 (1971). Here, the government produced three eyewitnesses: Agent Faz, and Detectives Graham and Plovanich. In addition, Otero never alleged how the CI's testimony would have been helpful to him, or how it would have differed from the government's other eyewitnesses. As his last stand, Otero also

argues that, despite our ruling to the contrary in *Terry*, he should not have to articulate specific instances of actual prejudice to his defense at trial, citing as support *Moore v. Arizona*, 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973), in which the United States Supreme Court vacated an Arizona Supreme Court judgment denying a defendant's state petition for a writ of habeas corpus without a hearing. In reaching its decision in *Moore*, the Supreme Court stated:

> The [Arizona] state court was in fundamental error in its reading of *Barker v. Wingo* and in the standard applied in judging petitioner's speedy trial claim. *Barker v. Wingo* expressly rejected the notion that an affirmative demonstration of prejudice was necessary to probe a denial of the constitutional right to a speedy trial.

*Id.* at 26, 94 S.Ct. at 189. In *Terry*, we read *Moore* as merely proscribing the use of the prejudice factor as solely dispositive of the sixth amendment speedy trial claim. *Terry*, 715 F.2d at 1221 n. 3. In our view, *Moore* required only that we weigh carefully "all of the factors in light of the relevant circumstances presented," which is what we have done here.

For the foregoing reasons, the judgment below is

AFFIRMED.

CUDAHY, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority about all the matters in contention here except Otero's right to a hearing on his speedy trial claim. With respect to Otero's request for a hearing it seems to me that the majority's focus on the trees tends to obscure the forest.

There has been an almost unprecedented and thoroughly extraordinary delay of nearly ten years between indictment and trial. As the majority notes, the government has conceded that this was "presumptively prejudicial." Further, as the majority also points out, the government now only contends rather weakly that "arguably, defendant's status necessitated the delay in bringing him to trial." Given

these factors alone, a hearing to establish some ascertainable facts about the long hiatus seems essential. At the very least, there should be a hearing to establish the facts before the declaration of Otero's "fugitive" status in 1979.

The majority responds to these imperatives by finding various deficiencies in the defendant's pleadings or arguments or by relying on his failure to take timely action on the speedy trial claim. Although Otero twice expressly requested an evidentiary hearing, he no doubt could have proceeded much more effectively—and this is reflected in his claim of ineffective assistance of counsel. But none of the defendant's alleged defaults are sufficiently weighty to overbalance a ten-year delay that was presumptively prejudicial.

Under these circumstances, the government is obliged to offer some credible explanation of its failure to arrest the defendant and bring him to trial. Perhaps he was throughout the period a fugitive that the government with reasonable efforts could not have apprehended. But we can now only speculate that this was the case. I think the matter must be remanded for a hearing to ascertain reasons for the delay.

With respect to the matters noted, I respectfully dissent.